**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RYSHEEN A. JACKSON,** | : | **CIVIL NO. 3:03-CV-1725** |
| **Plaintiff,** | : | |
| | : | **(Judge Munley)** |
| **v.** | : | |
| | : | |
| **MARGARET GORDON,** *et al.*, | : | |
| **Defendants** | : | |

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## MEMORANDUM

Plaintiff Rysheen Jackson ("Jackson"), a former Pennsylvania state inmate who, at all times relevant, was housed at the State Correctional Institution at Camp Hill ("SCI-Camp Hill"), Pennsylvania, commenced this civil rights action on September 30, 2003.  (Doc. 1.) The complaint was supplemented on December 11, 2003.  (Doc. 15.)  Before the court are motions for summary judgment pursuant to Federal Rules of Civil Procedure 56 filed on behalf of remaining defendants Margaret Gordon ("Gordon"), William Harris ("Harris"), Donald Kelchner ("Kelchner"); and Theresa Law ("Law") (Doc. 156), and Martin Lasky ("Lasky") and  Colleen Newfield ("Newfield") (Doc. 157).  For the reasons set forth below, both motions will be deemed unopposed and granted.

## I.    Relevant Procedural Background

This Court initially disposed of this matter on March 12, 2004, by granting a motion for summary judgment filed on behalf of defendants Lasky and Newfield and granting a motion to dismiss the complaint as to defendants Gordon, Law, Harris, James, Burks, Kelchner and Magee.  (Doc. 52.)  Jackson filed an appeal and the United States Court of

Appeals affirmed in part and vacated in part the March 12, 2004 decision, and remanded the following claims for further proceedings: First Amendment retaliation claim against Gordon, Kelchner, Law, Lasky, Newfield, and Harris; Fourteenth Amendment due process claim against Gordon, Law, Lasky and Harris; Fourteenth Amendment Equal Protection claim against Gordon, Lasky, and Newfield; Eighth Amendment cruel and unusual punishment claim against Gordon, Law, Harris and Kelchner; and, the state law claims.  (Doc. 79-2, at 8.)

Following remand, the remaining defendants were directed to answer or file pretrial motions by November 5, 2005.  (Doc. 80.)  Jackson filed a motion to stay proceedings pending disposition of his petition for writ of certiorari to the United States Supreme Court. (Doc. 81.)  By Order issued December 13, 2005, the action was stayed.  (Doc. 85.)  Jackson's petition for writ of certiorari was denied May 13, 2006.  Jackson v. Gordon, 547 U.S. 1175 (2006).

Nearly five years later, on April 11, 2011, Jackson filed a motion to lift the stay and a motion for a preliminary injunction.  (Doc. 90.)  The stay was lifted (Doc. 94), and the motion for a preliminary injunction was denied (Doc. 108).  Jackson appealed the denial of the preliminary injunction.  (Doc. 118.)  On June 11, 2012, the United States Court of Appeals for the Third Circuit issued a mandate affirming the denial of the preliminary injunction and remanded the matter for further proceedings.  (Doc. 123.)

A scheduling order was issued on September 12, 2012 (Doc. 126) and following the close of discovery, all remaining defendants moved for summary judgment. (Docs. 132, 133.) Jackson failed to respond to the motions.  Instead, he requested an extension of the discovery

deadline and moved to stay the action.  (Doc. 140, 153.)  His request for a stay was denied, but his request for an extension of the discovery deadline was granted, and the discovery deadline was extended until October 15, 2013.  (Doc. 155.)  Defendants' motions (Docs. 132, 133) for summary judgment were denied without prejudice to refile by November 1, 2013. (Doc. 155.)

On November 1, 2013, defendants Gordon, Harris, Kelchner, and Law filed a motion for summary judgment.  (Doc. 156.)  The statement of material facts and supporting exhibits (Doc. 159) and supporting brief (Doc. 158) were filed on November 15, 2013.  On November 1, 2013, defendants Lasky and Newfield also moved for summary judgment.  (Doc. 157.) Their supporting brief (Doc. 161) and statement of material facts (Doc. 162) were filed on November 20, 2013.[1]  Jackson failed to respond to defendants' motions.  Therefore, on December 10, 2013, he was notified that he had until December 27, 2013, to file briefs in response to the motions and to respond to defendants' statements of material facts.  (Doc. 163.)  He was advised that failure to file briefs opposing the motions would result in the motions being deemed unopposed.  (Id. at ¶ 2, citing L.R. 7.5.)  He was also informed that failure to timely file a statement of material facts would result in defendants' statements of material facts being deemed admitted.  (Id. at ¶ 3(b), citing L.R. 56.1.)  The time period for filing oppositions briefs and statements of material facts has expired.  Jackson has failed to file the requisite documents or seek an enlargement of time to do so.  Consequently, the

---

[1]Defendants sought, and were granted, a brief extension of time in which to file a supporting brief and statement of facts.  (Doc. 163.)

motions are deemed unopposed.

## II.   <u>Summary Judgment Standard of Review</u>

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  <u>See</u> FED. R. CIV. P. 56(c).  The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief.  <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  "'The non-moving party may not simply sit back and rest on the allegations in the complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, and designate specific facts showing that there is a genuine issue for trial.'  <u>Celotex [ ]</u>, 477 U.S. [ ] 324 [ ] (1986) (internal quotations omitted)."  <u>Schiazza v. Zoning Hearing Bd., Fairview Twp., York County, Pa</u>, 168 F. Supp. 2d 361, 365 (M.D. Pa. 2001).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986); <u>see also</u> FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action proceed.  <u>Pappa</u>s, 331 F. Supp. 2d at 315.

## III.   <u>Statement of Material Facts</u>

"A motion for summary judgment filed pursuant to FED. R. CIV. P. 56 shall be accompanied by a separate, short and concise statement of the material facts . . .  as to which

4

the moving party contends there is no genuine issue to be tried." <u>See</u> L.R. 56.1.  The

opposing party shall file a separate statement of the material facts as to which it is contended

that there exists a genuine issue to be tried.  <u>Id.</u>  "All material facts set forth in the statement

required to be served by the moving party will be deemed to be admitted unless controverted

by the statement required to be served by the opposing party."  <u>Id.</u>  Because Jackson failed to

oppose defendants' statements, all facts contained therein are deemed admitted.

On May 5, 2002, while incarcerated in the restricted housing unit ("RHU") at the State

Correctional Institution at Mahanoy ("SCI-Mahanoy"), Jackson was evaluated by a

registered nurse, who cleared him for his transfer to SCI-Camp Hill that was scheduled for

May 22, 2002.  (Doc. 162, ¶ 7.)  On May 16, 2002, while still at SCI-Mahanoy, after refusing

his fourth meal of "nutraloaf," he was scheduled to see a nurse for assessment.[2]  (Doc. 161-1,

at 33.)  On that same day, he was seen by nurse Mooney who recorded Jackson as stating "I

won't eat that, I'm vegetarian and there's meat in the loaf, so I'm not going to eat it."  (Doc.

162, ¶ 8.)  She conducted a thorough examination, documented his vital signs, recorded his

weight at 204 pounds, and noted that a change in nutrition may be necessary due to his

refusal of meals.  (<u>Id.</u>)  Monitoring was deemed necessary per protocol.  (Doc. 161-1, at 34.)

She also read him the starvation policy.  (Doc. 162, ¶ 8.)

He was released from the RHU and noted to refuse a seventh consecutive meal on

_____

[2]"Nutri-loaf," or "food loaf"is a nutritional food product served prison inmates who
misuse their food.  <u>Banks v. Beard</u>, No. 2:03-CV-659, 2006 W 2192015, at *11 (W.D.Pa.
April 1, 2006).

May 17, 2002.  (Doc. 162, ¶ 9.)  He was seen by nurse Mooney, who indicated that his

examination was normal.  (<u>Id.</u>)  He informed her that he was drinking water.  (<u>Id.</u>)  Later that

day a different nurse noted that he ate his lunch.  (<u>Id.</u>)

On May 22, 2002, Jackson was transferred to SCI-Camp Hill.  (Doc. 159, ¶ 2; Doc.

162, ¶ 10.)  On August 6, 2002, he discussed his diet with defendant Newfield.  (Doc. 159,  ¶

3; Doc. 162, ¶ 12.)  She noted that he had been a vegetarian since 1999, and that he was on

the DOC's alternate protein diet.  (Doc. 162, ¶ 12.)  He complained that milk and milk

products gave him abdominal cramps and diarrhea and that eggs gave him a rash. (Doc. 159,

¶ 3; Doc. 162, ¶ 12.)  She assessed him with lactose intolerance and egg allergy.  (<u>Id.</u>)  After

discussions with defendant Lasky, she prepared a therapeutic diet order requesting a

vegetarian, egg and lactose free diet. (Doc. 159, ¶ 4; Doc. 162, ¶ 12.)

A therapeutic diet is a diet or a dietary regimen prescribed by a physician or

physician's assistant that is used as therapy for a diagnosed medical condition as part of an

overall health care plan.  (Doc. 159, ¶ 7.)  The procedures relevant to the DOC's Therapeutic

Diet Program are set forth in the DOC's Food Services Procedures Manual, DC-ADM 610.

(<u>Id.</u> at ¶ 8.)  Pursuant to the policy, standard therapeutic diets are available to any inmate who

is provided with a prescription by a physician, physician's assistant, dentist, or psychiatrist.

(<u>Id.</u> at ¶ 9.)  The standard therapeutic diets are specified calorie diets (1500 Kcal, 2000 Kcal,

2500 Kcal, or 3000 Kcal diets), cardiac diets, renal diets (60g pro, 80g pro), high calorie and

protein diets, and diets designed for chewing, swallowing or digestive needs (mechanical soft

foods, purée, clear liquid, full liquid or lactose restricted).  (<u>Id.</u> at ¶ 10.)

A lactose and egg free diet is considered a non-standard therapeutic diet.  (Doc. 159, ¶ 11.)  All requests for non-standard therapeutic diets are required to be submitted by a physician, physician's assistant, dentist or psychiatrist and must be reviewed by the medical director at the requesting institution.  (Id. at ¶ 12.)  Following review by the medical director, any requests for non-standard therapeutic diets are submitted to defendant Gordon[3], the DOC's Clinical Dietician, for review of the clinical parameters of the proposed diet, feasibility of the request, and the medical need for the diet.  (Doc, 159, ¶ 5; Doc. 162, ¶¶ 12-13.)  Gordon is required to review requests for non-standard therapeutic diets to ensure that meals offered under the proposed diet are nutritionally adequate while complying with the clinical parameters of the diet and to ensure that the proposed diet is medically necessary.  (Doc. 159, ¶ 14.)  Non-standard therapeutic diets are not permitted without a determination of medical necessity due to the costs and time associated with preparing such diets. These considerations include the time for review and preparation of a nutritionally adequate specialized menu plan, the time and costs associated with purchasing items that may not be available on the DOC's master menu, and the time and costs associated with specialized preparation of the menu items by the kitchen staff at the institution where the inmate is housed.  (Id. at ¶ 15.)

Jackson's non-standard therapeutic diet order form was submitted to defendant

---

[3]Ms. Gordon is licensed by the Commonwealth of Pennsylvania as a Registered Dietician. (Doc. 159,  ¶ 6.)

Gordon for review pursuant to the DOC's Therapeutic Diet Program.  (Doc. 159, ¶ 5; Doc. 162, ¶ 12.)  Gordon reviewed the request and, on or about August 12, 2002, issued a directive that Jackson be provided a non-standard therapeutic diet consisting of an alternate protein, removal of milk with no replacement; replacement of dairy desserts with fruit; replacement of  any alternate protein containing cheese or eggs as a major ingredient, and removal of eggs from breakfast with no replacement. (Doc. 159, ¶ ¶ 16-17.)  The adjusted diet was deemed nutritionally adequate.  (Id. at ¶ 18.)  In September 2002, following Newfield's receipt of an email from Gordon indicating that she had forwarded a letter to the kitchen regarding how to implement a vegetarian, egg and lactose free diet to the kitchen, Newfield spoke to defendant Harris, the Food Services Manager, and he indicated that he would take care of implementing the diet.   (Doc. 162, ¶ 13.)

On October 15, 2002, Jackson complained to Newfield that he was not getting enough of the right foods in his vegetarian, lactose, and egg free diet, and that he was experiencing fatigue and salt and sugar cravings.  (Doc. 162, ¶ 14.)  He agreed to be weighed and Newfield noted, based on his recorded weights, 10/15/02 - 202 lbs.; 09/17/02 - 204 lbs.; 08/20/02 - 204 lbs.; 07/23/02 - 204 lbs.;  06/25/02 - 205 lbs, that he did not have significant weight loss.  (Id.)  She ordered blood chemistry and a complete blood count with differential. (Id.)

In December 2002, Jackson was seen by Newfield on two separate occasions complaining of watery stools up to twice a day since the conclusion of Ramadan and weight loss.  (Doc. 162, ¶¶ 16-17.)  On the first visit, he had no complaints of abdominal pain or gas.

8

(Id. at ¶ 16.)   "His abdomen was soft and nontender and bowel sounds were heard in all four quadrants."  (Id.)  Newfield's assessment was that the change in his bowel habits and the possibility of slight weight loss were probably secondary to the Ramadan fast and dietary changes.  (Id.)  During the second visit, he complained about his diet and reported that he believed there was milk in the bread.  (Id. at ¶ 17.)  He again stated that he was having loose stools up to twice a day.  Newfield discussed the case with Dr. Lasky who instructed her to advise Jackson that if he had questions or complaints about his diet, he should contact either the DOC's dietician or food service.  (Id.)

Thereafter, Jackson complained to Gordon that he was having difficulty digesting the milk and eggs in bread and other baked products.  (Doc. 159, ¶ 19.)  He alleges that in January 2003, he was informed by the Acting Food Service Manager that Gordon was reviewing his diet and that he would remain on an alternate protein diet pending review.  (Id. at ¶ 22.)  His "concerns were not a non-meat diet per se, but a diet compensating him in place of the milk and egg product which he cannot consume, with an alternate protein diet like before."  (Doc. 1, ¶ 25.)   Because such a degree of intolerance in digesting egg or milk is uncommon, Gordon requested that the lactose intolerance and the egg allergy be substantiated with medical documentation.  (Doc. 159, ¶ 20.)

Over the course of the next several months, Jackson continued to complain about the diet he was provided.  (Doc. 162, ¶¶ 19, 21, 23-25, 27, 35-38.)  At no time was he in acute medical distress.  (Id. at ¶¶ 20, 21, 23, 27).  He was provided TUMS as a calcium supplement (Id. at ¶ 21), was advised on dietary options (Id. at ¶¶ 17-19, 23, 24), and the medical

department attempted to monitor his weight (<u>Id.</u> at ¶¶ 27, 34) and offered him solutions for his recurring bowel problems (<u>Id.</u> at ¶¶ 16-18, 35, 36).

On March 10, 2003, Gordon notified Jackson *via* correspondence that "[a]ccording to DOC policy, a therapeutic diet is prescribed to meet a medical need, not a personal need. [She] requested the medical department at SCI-Camp Hill validate the need to restrict both eggs and lactose in [his] diet.  Without documented medical need, a diet eliminating all animal protein cannot be provided."  (Doc. 161-4 at 24.)

In April 2003, Jackson filed Grievance 48852 requesting the approval of a vegetarian, egg and lactose free diet. (Doc. 159, ¶ 28.)  On April 16, 2003, defendant Harris informed him that Gordon had requested validation of the medical necessity of the diet from the medical staff and that no testing had been done to validate the medical necessity.  (<u>Id.</u> at ¶ 29.)  He suggested that plaintiff request an alternate protein diet if he chose not to eat meat. (<u>Id.</u>)  This decision was appealed to defendant Kelchner, the Superintendent at SCI-Camp Hill. (<u>Id.</u> at ¶ 30.)  By decision issued April 28, 2003, defendant Kelchner informed him that defendant Gordon and staff at the institution had reviewed his special diet request and were awaiting a determination by medical staff regarding the medical necessity of that request. (<u>Id.</u> at ¶ 31.)  Defendant Kelchner further informed Jackson that he would forward a copy of the appeal decision to defendant Law for her review.  (<u>Id.</u>)  The grievance was then remanded for further investigation and response. (<u>Id.</u>)

On May 6, 2003, defendant Lasky requested a consult from an allergist for the purpose of testing.  (Doc. 159, ¶¶24, 32.)  On May 9, 2003, the reviewing regional medical

director denied the request as medically unnecessary.  (<u>Id.</u> at ¶33.)  Thereafter, defendant

Kelchner informed Jackson that, after review of his file, medical staff had concluded that his

symptoms did not reflect an allergy requiring the diet he was requesting.  (<u>Id.</u> at ¶ 34.)

Gordon was informed of this decision by copy of a response to the grievance appeal dated

May 16, 2003.  (<u>Id.</u> at ¶ 25.)   Because no medical documentation was provided to

substantiate Jackson's need for a lactose and egg free diet, the request for a non-standard

therapeutic diet was denied.  (<u>Id.</u> at ¶¶ 23, 26.)

   Jackson filed an appeal to final review with the Secretary's Office of Inmate

Grievances and Appeals.  (Doc. 159, ¶ 35.)  On May 28, 2003, he was granted additional

time to provide the required paperwork associated with his appeal.  (<u>Id.</u> at ¶ 36.)  By decision

issued July 11, 2003, his appeal was dismissed as untimely.  (<u>Id.</u> at ¶ 37.)

IV.   **Discussion**

A.     **Constitutional Claims**

Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials.  <u>See</u> 42 U.S.C. § 1983.  The statute provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

<u>Id.</u>; <u>see</u> <u>also</u> <u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 284-85 (2002); <u>Kneipp v. Tedder</u>, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988).

Preliminarily, defendant Law seeks judgment based on her lack of personal involvement in conduct amounting to a constitutional violation.  (Doc. 158, at 5.)  "A defendant in a civil rights action must have personal involvement in the alleged wrongs. . . . Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207-08 (3d Cir. 1988); <u>see</u> <u>also</u>, <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976); <u>Atkinson v. Taylor</u>, 316 F.3d 257 (3d Cir. 2003).  Allegations of participation or actual knowledge and acquiescence, however,

must be made with appropriate particularity.  Rode, 845 F.2d at 1207-08.  Individual liability

can be imposed under Section 1983 only if the state actor played an "affirmative part" in the

alleged misconduct.  Rode, *supra*.  Alleging a mere hypothesis that an individual defendant

had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient

to establish personal involvement.  Rode, 845 F.2d at 1208.  Jackson alleges that defendant

Law failed to respond to letters concerning his diet.  However, according to the record, Law's

involvement was limited to defendant Kelchner informing Jackson that he would forward a

copy of the appeal decision to defendant Law for her review.  A state prisoner's allegation

that prison officials and administrators responded inappropriately, or failed to respond to a

prison grievance, did not establish that the officials and administrators were involved in the

underlying allegedly unconstitutional conduct.  Brooks v. Beard, 167 F. App'x 923, 925 (3d

Cir. 2006); see also Croom v. Wagner, No. 06-1431,  2006 WL 2619794, at *4 (E.D. Pa.

Sept. 11, 2006) (holding that neither the filing of a grievance nor an appeal of a grievance is

sufficient to impose knowledge of any wrongdoing); Ramos v. Pennsylvania Dept. of

Corrections, No. 06-1444, 2006 WL 2129148, at *2 (M.D. Pa. July 27, 2006) (holding that

the review and denial of the grievances and subsequent administrative appeal does not

establish personal involvement).  Defendant Law is therefore entitled to an entry of summary

judgment on all remaining claims.

### 1.      First Amendment Retaliation

Jackson asserts that defendants Gordon, Kelchner, Lasky, Newfield and Harris

suspended his therapeutic diet in retaliation for grievances he filed.  The First Amendment

offers protection for a wide variety of expressive activities.  See U.S. Const. amend I.  These rights are lessened, but not extinguished in the prison context, where legitimate penological interests must be considered in assessing the constitutionality of official conduct.  See Turner v. Safley, 482 U.S. 78, 89 (1987).  Retaliation for expressive activities can infringe upon an individual's rights under the First Amendment.  See Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000).  To prevail on a retaliation claim under 42 U.S.C. § 1983, plaintiff must demonstrate:  (1) that he was engaged in protected activity; (2) that he suffered an "adverse action" by government officials; and (3) that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him."  Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001) (quoting Allah, 229 F.3d at 225).  The last Rauser prong requires a prisoner to establish a causal link between the exercise of his constitutional rights and the adverse action taken against him.  The court employs a burden-shifting regime to determine whether a causal link exists.  The prisoner bears the initial burden of proving that his constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him or retaliate against him.  See id. (citing Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).  The burden then shifts to the defendants to prove by a preponderance of the evidence that they would have taken the same action even in the absence of the protected activity.  See id.  If defendants prove that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest, they will prevail in the retaliation action.  See id. at 334.

Filing an administrative grievance against prison officials is a protected activity for

purposes of a retaliation claim.  See Robinson v. Taylor, 204 F. App'x. 155, 157 (3d Cir. 2006).  Thus, the first prong of Rauser, i.e., that the plaintiff be engaged in a constitutionally protected activity, has been satisfied.

Once it is determined that the inmate was engaged in protected conduct, he must demonstrate that he has suffered some adverse action at the hands of prison officials.  See Rauser, 241 F.3d at 333 (citing Allah, 229 F.3d at 225).  To show an "adverse action," the plaintiff must demonstrate that defendants' actions were "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights."  Allah v. Al-Hafeez, 208 F. Supp. 2d 520, 535 (E.D. Pa. 2002), quoting Allah, 229 F.3d at 225.  The suspension of Jackson's non-standard therapeutic diet arguably constitutes adverse action.  See Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003) (finding alleged denial of high fiber diet and delaying medical appointment sufficient to support retaliation claim); Cf. Davidson v. Chestnut, 193 F.3d 144, 149 (2d Cir.1999) (observing that denial of kosher diet is an adverse action that may support retaliation claim).

In analyzing the third element the court must determine whether there is a causal connection between the exercise of the constitutional right and the adverse action.  The plaintiff must show that the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action.  This "motivation" factor may be established by alleging a chronology of events from which retaliation plausibly may be inferred.  Tighe v. Wall, 100 F.3d 41, 42 (5th Cir. 1996); Goff v. Burton, 91 F.3d 1188 (8th Cir. 1996); Pride v. Peters, 72 F.3d 132 (Table) (7th Cir. 1995).  It is plaintiff's burden to prove that defendants

were motivated by retaliation.  Hannon v. Speck, No. 87-3212, 1988 WL 131367, at *4 (E.D.

Pa. Dec. 6, 1988) ("In bringing a § 1983 action alleging such retaliation, an inmate faces a

substantial burden in attempting to prove that the actual motivating factor . . . was as he

alleged.") (internal quotes and citation omitted), aff'd, 888 F.2d 1380 (3d Cir. 1989) (Table).

Where the prisoner seeks to establish this causal link based upon the temporal proximity

between the protected conduct and the alleged retaliatory act, "the timing of the alleged

retaliatory action must be unusually suggestive before a causal link will be inferred."  Krouse

v. American Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997); Rauser, 241 F.3d at 334; see

also Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) (concluding that the

temporal proximity, nearly six months, is not unduly suggestive and does not sufficiently

establish any causal link).

Jackson fails to establish a causal link between the filing of his grievance and the

suspension of his non-standard therapeutic diet.  In October 2002, he complained to the

medical department that he was unable to digest the foods served in his non-standard

therapeutic diet.  Over the course of the next few months, he presented to the medical

department with the same or similar complaints and was treated and advised each time.  In

December 2002, the medical department suggested that he contact either the state dietician or

food service.  Jackson complained to defendant Gordon, the dietician, that he was unable to

digest the non-standard therapeutic diet food.

In January 2003, he was informed by the acting food supervisor that defendant

Gordon was reviewing his diet and that he would remain on an alternate protein diet pending

review.  Because such a degree of intolerance was uncommon, defendant Gordon notified the

medical department that his lactose intolerance and egg allergy needed to be substantiated

with medical documentation.  Moreover, Gordon wrote to Jackson in March 2003, and

informed him that she was seeking medical confirmation because a diet completely free of

animal protein was not allowed unless there was a documented medical need.  On March 10,

2003, Gordon notified Jackson *via* correspondence that "[a]ccording to DOC policy, a

therapeutic diet is prescribed to meet a medical need, not a personal need. [She] requested the

medical department at SCI-Camp Hill validate the need to restrict both eggs and lactose in

[his] diet.  Without documented medical need, a diet eliminating all animal protein cannot be

provided."  (Doc. 161-4 at 24.)  When Jackson filed a grievance the following month, on

April 8, 2003, it was reiterated that defendant Gordon was awaiting medical confirmation of

his lactose intolerance and egg allergy.  In the end, because no medical documentation was

provided, Jackson's request for a non-standard therapeutic diet was denied.  It is clear that

the review of his diet and request for supporting medical documentation pre-dated the filing

of the grievance.  Hence, there is no causal link.[4]  Defendants Gordon, Kelchner, Lasky,

Newfield and Harris are therefore entitled to an entry of summary judgment on Jackson's

---

[4]However, even if Jackson met the causal link requirement, and the burden shifted to the defendants, Jackson's claim would still fail.  Defendants have demonstrated that they would have taken the same action absent the protected conduct.  Specifically, it is clear from the record that the refusal to continue Jackson's request for a special diet was due to the lack of medical documentation supporting such a request as well as a concern about a diet eliminating all animal protein.  There is simply no evidence that defendants' decision was motivated by retaliation.

retaliation claim.

2. Fourteenth Amendment Due Process

In order to state a claim of a violation of procedural due process under the Due

Process Clause of the Fourteenth Amendment, a plaintiff must first set out facts which

demonstrate that he had a protected liberty interest that was impaired by the defendants'

actions. Hewitt v. Helms, 459 U.S. 460 (1983) (overruled in part on other grounds by Sandin

v. Conner, 515 U.S. 472 (1995)); Morrissey v. Brewer, 408 U.S. 471 (1972). Once a court

determines that the interest asserted is protected by the Due Process Clause, the question then

becomes what process is due to protect it. Morrissey, 408 U.S. at 481.

In the matter *sub judice*, Jackson's claim fails because he does not have a liberty

interest in receiving a special diet. See Board of Regents v. Roth, 408 U.S. 564, 577 (1972)

(holding that an individual has a due process interest in something where he has "more than

an abstract need or desire for it. He must have more than a unilateral expectation of it. He

must, instead, have a legitimate claim of entitlement to it"). See generally Sandin v. Conner,

515 U.S. 472, 484, (1995) (explaining that, to establish a procedural due process claim based

on the violation of a liberty interest, an inmate must show that the actions of prison officials

amounted to "atypical and significant hardship on the inmate in relation to the ordinary

incidents of prison life"). Cf. Rogers v. United States, 696 F. Supp.2d 472,  500–01

(W.D.Pa. 2010) (finding that prisoners do not have a due process interest in religiously

compliant meals); Griffis v. Grundy, 47 F. App'x. 327, 328 (6th Cir. 2002) (quoting Sandin,

515 U.S. at 484) in finding that placement on a food loaf diet does not constitute an "atypical

and significant hardship on the inmate in relation to the ordinary incidents of prison life[,]' "

and thus does not implicate a due process liberty interest).  In the absence of such an interest,

a plaintiff cannot sustain a due process claim.  See Board of Regents, *supra*, 408 U.S. 564

(stating that absent a cognizable interest, no process is required before deprivation).

Therefore, defendants Gordon, Lasky and Harris are entitled to an entry of summary

judgment on Jackson's due process claim.

### 3.    Fourteenth Amendment Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that a state may

not "deny to any person within its jurisdiction the equal protection of the laws," which is

essentially a direction that all persons similarly situated should be treated alike. U.S.

CONST., amend. XIV; City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)

(citing Plyer v. Doe, 457 U.S. 202, 216 (1982)).  An equal protection claim can be brought

by a "class of one," a plaintiff alleging that he has been "intentionally treated differently from

others similarly situated and that there is no rational basis for the difference in treatment."

Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000); Williams v. Morton, 343 F.3d 212,

221 (3d Cir. 2003); see also Jean–Pierre v. Bureau of Prisons, 497 F. App'x 164, 168 (3d Cir.

2012).  If a distinction between persons does not implicate a suspect or quasi-suspect class,

state action will be upheld if it is rationally related to a legitimate state interest.  See Tillman

v. Lebanon County Corr. Facility, 221 F.3d 410, 423 (3d Cir. 2000).  Proof of disparate

impact alone, however, is not sufficient to succeed on an equal protection claim; a plaintiff

also must prove that the defendant intended to discriminate.  See Vill. of Arlington Heights v.

19

Metro. Housing Dev. Corp., 429 U.S. 252, 264–66 (1977); Washington v. Davis, 426 U.S. 229, 242, 244–45 (1976).  Thus, discriminatory intent must be a motivating factor in the decision, even though it need not be the sole motivating factor.  See Vill. of Arlington Heights, 429 U.S. at 265–66.  Moreover, to prove a lack of rational basis, a plaintiff must negate every conceivable rational basis for his differential treatment.  See Bd. of Trustees v. Garrett, 531 U.S. 356, 367 (2001); Ramsgate Court Townhome Ass'n v. West Chester Borough, 313 F.3d 157, 160 (3d Cir. 2002).

In remanding this claim for further consideration, the United States Court of Appeals for the Third Circuit specifically stated as follows: "The District Court concluded that 'the claim advanced by Plaintiff is that he, as an individual, not based upon membership in a particular class, was treated unfairly with respect to his request for a special diet.'  *See* District Court Memorandum at 17.  The District Court accurately characterizes Jackson's allegations as to Kelchner.  *See* Complaint at ¶ 62.  However, Jackson specifically alleged that Gordon, Law, Lasky, and Newfield denied him a needed therapeutic diet because he was a vegetarian.  *See id.* at ¶ 56. Although vegetarians are not a suspect or quasi-suspect class, the District Court is still obligated to consider whether the prison had a rational basis for denying Jackson's diet because he is a vegetarian." (Doc. 79-2, at 6.)

The record is devoid of evidence that would support a finding that Jackson was denied his non-standard therapeutic diet because he was a vegetarian.  In fact, Jackson conceded in his complaint that his "concerns were not a non-meat diet per se, but a diet compensating him in place of the milk and egg product which he cannot consume, with an alternate protein diet

like before." (Doc. 1, ¶ 25.) Yet, Jackson fails to recognize that DOC policy prohibits a diet eliminating all animal protein absent proof of medical necessity. No such documentation was provided. Consequently, defendants' decision to deny Jackson's request for a special diet was rationally based. Summary judgment will be entered in favor of defendants Gordon, Lasky, and Newfield on this claim.

### 4.   Eighth Amendment Deliberate Indifference

The Eighth Amendment's prohibition of cruel and unusual punishment forbids prison officials from subjecting prisoners to inhumane conditions of confinement. Farmer v. Brennan, 511 U.S. 825, 832 (1994). "[P]rison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates[.]' " Id. (quoting Hudson v. Palmer, 468 U.S. 517, 526–27 (1984)). To state a claim challenging conditions of confinement, an inmate must allege facts that would, if proven, establish that the deprivation of his right was objectively serious and the prison official had a sufficiently culpable state of mind—that is, that the official acted with deliberate indifference. Beers–Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001) (citing Farmer, 511 U.S. at 834 (1994)).

Whether the harm is objectively serious is measured by society's view of the risk to the prisoner's health and safety, that is, "whether 'it violates contemporary standards of decency to expose anyone unwillingly to such a risk.' " Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 257 (3d Cir. 2010) (quoting Helling v. McKinney, 509 U.S. 25, 36 (1993)). Restrictive or harsh conditions are part of prison life. Rhodes v. Chapman, 452 U.S.

337, 347 (1981).  Only conditions that deprive the prisoner of one of life's necessities, such as food, water, clothing, shelter, and medical care are unconstitutional.  Griffin v. Vaughn, 112 F.3d 703, 709 (3d Cir. 1997). Thus, unless the condition is objectively serious, there is no constitutional deprivation.

With respect to the second element of this test, an inmate must demonstrate deliberate indifference to prison conditions on the part of prison officials.  Farmer, 511 U.S. at 833–34; Wilson v. Seiter, 501 U.S. 294, 302–03 (1991); Rhodes, 452 U.S. at 347 (1981).  The deliberate indifference requires that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837.

This claim was remanded based on the following: "[T]he District Court erred in dismissing the Eighth Amendment claim of cruel and unusual punishment against Gordon, Law, Harris, and Kelchner for failure to state a claim.  If all reasonable inferences are taken in Jackson's favor, he states an Eighth Amendment claim against these defendants. Jackson alleged that he is severely lactose intolerant and allergic to eggs, that he was given 'inadequate meals,' that 'in order for [him] to eat food, he has to get food from other inmates *via* a 'transportation device,' which is disgusting and unsanitary,' that 'this denial of a therapeutic diet is taking a serious toll on his health,' and that he suffers "constant hunger" from the 'lack of proper nutrition.'  *See* Complaint at ¶¶ 14, 17, 33, 35, 51, 52. *See also id.* at ¶¶ 50, 53 (implying that Jackson does not receive a 'proper or adequate' diet)."  (Doc. 79-2,

at 4-5) (footnote omitted).

Jackson's claim is not sufficiently serious to amount to the type of extreme deprivation that the Eighth Amendment prohibits. Prisons must provide nutritionally adequate food. Laufgaus v. Speziale, 263 Fed. App'x 192, 198 (3d Cir. 2008) (non-precedential). A prisoner's diet must be adequate to maintain health and served in a sanitary manner. Maldonado v. McFaden, No. 94–1477, 1994 U.S. Dist. LEXIS 16837, at *11 (E.D.Pa. Nov. 23, 1994). It need not be appetizing. Jones v. Beard, No. 10–5544, 2011 WL 3611470, at *8 (E.D.Pa. Aug.16, 2011) (citation omitted). Only a substantial deprivation of food to a prisoner sets forth a viable Eighth Amendment claim. Warren v. Irvin, 985 F. Supp. 350 (W.D.N.Y.1997); Williams v. Berge, 2002 WL 32350026 *2 (W.D.Wis.2002); Moss v. Ward, 450 F.Supp. 591, 596 (W.D.N.Y.1978) (deprivation of one meal may not be cruel and unusual punishment).

It is clear from the record that, at all times, Jackson was served nutritionally adequate meals. (Doc. 162, ¶ 14.) Although he continuously complained about his diet (Doc. 162, ¶¶ 19, 21, 23-25, 27, 35-38), at no time was he in acute medical distress. (Id. at ¶¶ 14, 20, 21, 23, 27). He was regularly examined. Blood chemistry and a complete blood count with differential was ordered by the medical department. (Id. at ¶ 14.) He was provided TUMS as a calcium supplement (Id. at ¶ 21), was advised on dietary options (Id. at ¶¶ 17-19, 23, 24), the medical department attempted to monitor his weight (Id. at ¶¶ 27, 34) and also provided solutions for recurring bowel problems (Id. at ¶¶ 16-18, 35,36). With respect to weight loss, he agreed to be weighed in October 2002 and, based on his recorded weights, 10/15/02 - 202

23

lbs.; 09/17/02 - 204 lbs.;  08/20/02 - 204 lbs.; 07/23/02 - 204 lbs.;  06/25/02 - 205 lbs, he did

not have significant weight loss (Id. at ¶ 14).  See Taskonas v. Cicchi, 308 F. App'x 628,

631–32 (3d Cir. 2009) (holding that twenty-four pound weight loss in two months, along

with a list of other medical conditions, was not an immediate danger to a prisoner's health

when the inmate did not complain of the conditions at their occurrence and the conditions did

not lead to concerns of long term health effects); Wilson v. Dragvoich, No. 96–2635, 1997

WL 799431, at *4 (E.D.Pa. Dec.31, 1997) (holding that weight loss does not amount to a

Constitutional violation when prisoner is within normal weight range for his age and height).

Although Jackson alleged in his complaint that his diet was causing damage to his health, he

has failed to come forward with evidence to support such allegations and, as indicated *supra*,

the record indicates that he was provided a nutritionally adequate diet and that he suffered no

adverse health consequences.  The party adverse to summary judgment must raise "more than

a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion

and cannot survive by relying on unsupported assertions, conclusory allegations, or mere

suspicions.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).  The

non-moving party must go beyond the pleadings and by affidavits, or by the depositions,

answers to interrogatories, and admissions on file,  designate specific facts showing that there

is a genuine issue for trial.  Schiazza, 168 F. Supp. 2d at 365.  Jackson has failed to meet his

burden.  Therefore, defendants Gordon, Harris, and Kelchner are entitled to an entry of

summary judgment on the eighth amendment claim.

**B.     State Law Claims**

"Supplemental jurisdiction allows federal courts to hear and decide state-law claims along with federal-law claims when they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." Wisconsin Dept. of Corrections v. Schacht, 524 U.S. 381, 387 (1998) (citation and internal quotation marks omitted).  "A district court can decline to exercise supplemental jurisdiction in several circumstances, including a situation where 'the district court has dismissed all claims over which it has original jurisdiction,' as in this case." Trinity Industries, Inc. v. Chicago Bridge & Iron Co., 775 F.3d 131, 135 (3d Cir. 2013) (quoting 28 U.S.C. § 1367(c)(3)).   Here, the Court is granting summary judgment on every claim over which it had original subject matter jurisdiction and declines to exercise supplemental jurisdiction over Jackson's state law claims pursuant to 28 U.S.C. § 1367(c)(3). See Taggart v. Norwest Mortg. Inc., 539 F. App'x 42, 45 (3d Cir. 2013).

**V.     Conclusion**

Based on the foregoing, defendants' motions (Docs. 156, 157) for summary judgment will be deemed unopposed and granted.

An appropriate Order follows.

                          **BY THE COURT:**


                          **s/James M. Munley**
                          **JUDGE JAMES M. MUNLEY**
                          **United States District Court**

Dated:   February 24, 2014